| STATE OF TENNESSEE | | CASE FILE NUMBER |
|---|---|---|
| 20TH JUDICIAL DISTRICT | **SUMMONS** | 12·1249-I |
| CHANCERY COURT | | |

| PLAINTIFF | DEFENDANT |
|---|---|
| Lisa C. Scott-Graham | Asurion Insurance Services |

TO:    (NAME AND ADDRESS OF DEFENDANT)

Asurion Insurance Services
648 Grassmere Park
Nashville, TN
37211

List each defendant on a separate summons.

Method of Service:

☐ Certified Mail
☐ Davidson Co. Sheriff
☐ *Comm. Of Insurance
☐ *Secretary of State
☐ *Out of County Sheriff
☐ Private Process Server
☐ Other
  *Attach Required Fees

YOU ARE SUMMONED TO DEFEND A CIVIL ACTION FILED AGAINST YOU IN CHANCERY COURT, DAVIDSON COUNTY, TENNESSEE. YOUR DEFENSE MUST BE MADE WITHIN THIRTY (30) DAYS FROM THE DATE THIS SUMMONS IS SERVED UPON YOU. YOU MUST FILE YOUR DEFENSE WITH THE CLERK OF THE COURT AND SEND A COPY TO THE PLAINTIFF'S ATTORNEY AT THE ADDRESS LISTED BELOW. IF YOU FAIL TO DEFEND THIS ACTION BY THE ABOVE DATE, JUDGMENT BY DEFAULT CAN BE RENDERED AGAINST YOU FOR THE RELIEF SOUGHT IN THE COMPLAINT.

Attorney for plaintiff or plaintiff if filing Pro Se:
(Name, address & telephone number)

Lisa Graham
129 Cherry hill -C3
Hedersonville, TN
37075

FILED, ISSUED & ATTESTED

AUG 2 8 2012

CRISTI SCOTT, Clerk and Master
By:
  Suite 308
  1 Public Square
  Nashville, TN 37201

Deputy Clerk & Master

**NOTICE OF DISPOSITION DATE**

The disposition date of this case is twelve months from date of filing. The case must be resolved or set for trial by this date or it will be dismissed by the Court for failure to prosecute pursuant to T.R.C.P. 41.02 and Local Rule 18.

If you think the case will require more than one year to resolve or set for trial, you must send a letter to the Clerk and Master at the earliest practicable date asking for an extension of the disposition date and stating your reasons. Extensions will be granted only when exceptional circumstances exist.

| TO THE SHERIFF: | DATE RECEIVED |
|---|---|
| | |
| | **Sheriff** |

***Submit one original plus one copy for each defendant to be served.

♿ADA Coordinator, Cristi Scott (862-5710)

## IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE

LISA C. SCOTT-GRAHAM,

Plaintiff

Vs.

ASURION INSURANCE SERVICES,

Defendant

No.

12·1249-I

## COMPLAINT

1.    Plaintiff Lisa C. Scott-Graham is a resident of Sumner County, Tennessee, and has been employed by Asurion Insurance Services from 1998', to date.  Asurion Insurance Services is the leader of cell phone Insurance providers, providing service to cell phone users across the country. Its  headquarters is located in Tennessee at:  648 Grassmere Park, Nashville, TN  37211.

The alleged retaliation the plaintiff has experienced at Asurion,  has been ongoing for several years to date.   We will start from the beginning which will show **why** the retaliation started, **and** the potentially severe risk to the company which fueled the mistreatment of the plaintiff, Lisa Graham, literally for years.

2.    On **4/15/2004**, plaintiff Lisa Graham gave a presentation to Asurion upper level management team on a discovery she made; which was, the company, Asurion, appeared to be fulfilling insurance claims with defective phones on several instances.
 Ms. Grahams primary job duty at the time, was to refund a customers deductible when he/she voided their claim for one  reason or another.  There were close to 100 of these refunds processed daily.  It turned out, one of the primary reasons for customers cancelling his/her claim , was for the fact they had received a defective phone.  The defendant Lisa Graham,  found a tool Asurion posessed that provided the ability to trace an ESN (electronic serial number) of a phone that had been shipped out by Asurion. This tool, would provide the life history of a phone that Asurion shipped; how many times Asurion shipped the phone, and WHY the phone was returned each time.  The plaintiff was on a team at Asurion  that was a problem solving team, called the Customer Satisfaction Team, and it was required that each team member at some point, do one of

many phones were not being properly repaired, before being sent out to another customer. Asurion has its own repair facility, located at its distribution center in Smyrna, TN. The phones that were traced , were phones that a customer had received after making an insurance claim. They then, called Asurion back at some point, stating the phone was defective. The customer then made the decision to cancel the claim for a refund of his/her deductible. (A lot of times, the customer opts for a reshipment of another phone, however the plaintiff would not have had knowledge of those serial numbers as she was not processing a refund request for those particular customers). However, Asurion's distribution department in Smyrna, TN, would receive and scan in the defective phone upon its return, in which the system would register the "reason" the phone was being returned (reason given by the customer). At this point, is when the phone is supposed to be evaluated by an Asurion repair technician; repaired if possible; or discarded if not. Through this whole discovery, the "reason" for the return, was consistently the same as when the phones were being sent back from previous customers. The discovery is something the plaintiff, Lisa Graham, truly felt no one was really aware of, and since these game films were (at that time) a requirement of each Customer Sat. representative, she felt this was a great opportunity as an eye opener to show what might be an unknown break in the system. Refurbishing phones, as said by management throughout the years at Asurion, is critical to the organization, as it is how Asurion makes/saves most of its money. Asurion refurbishes phones that prior customers have made a claim on; they also purchase refurbished phones from other outside sources. (Information given by management, to the Customer Satisfaction team per plaintiff).

**Please view included data printed from online forums from prior/present customers. These are some complaints, as well as recent BBB complaints filed, pertaining to this very issue. (Batch A)**

An attendee of the presentation, who is still employed with the company, and is witness to the information presented by plaintiff, Lisa Graham; is Tom Nagle, "VP Care Strategy". (cell number 615-969-4501, 615-837-3000 work). A couple of days following the presentation, Mr. Nagle approached Ms. Graham and stated someone had either taken or thrown away a huge flowchart that she made for the presentation. Mr. Nagle, also walked up to plaintiff, Lisa Grahams, desk a few years after the presentation, and asked if Ms. Graham still had any data pertaining to that presentation. She told him she didn't believe that she did.

   * Plaintiff, Lisa Graham, does not know if any/all witnesses are aware of her complaint against Asurion. All contact numbers were found in company Email directory.

Again, as a result of this discovery, and accidental findings, the plaintiff has experienced years of retaliation, railroading, threats, harassment, and it eventually turned into a form of discrimination, which seemed to be just another plot/ploy to drive the plaintiff away from a company she loved, and worked so hard for.

From this point on, is when the retaliation started; right around 3 weeks after the presentation of her discovery of defective phones being shipped over and over, and after already 6 years of employment thus far, with the company. (Plaintiff, has been with Asurion to date, for close to 15 years, and is a 49 year old white female). For the record, plaintiff Lisa Graham, has been an exemplary employee, making several fraud discoveries against the company throughout the years, (one resulting in a 1.5 million dollar restitution), she has been extremely hard working, and loyal, has great customer survey scores, obtained her insurance license through the "State of Tennessee Department of Commerce and Insurance" years ago (attached), which is supposed to be a huge gateway to promoting at Asurion. Plaintiff, Lisa Graham, has presented a lot of process improvement suggestions throughout the years, is not a trouble maker, doesn't "buck" the system, and has truly made the best interest of Asurion and its customers, a priority in her life. She has 25 years in the call center industry, some of it supervisory experience, and has been with Asurion from when they just had 35-40 employees total. Today it is said, there are almost 10,000 individuals worldwide employed by Asurion.

**Please view included data, of some of plaintiffs customer surveys about their call experience with her, etc.. (Batch B).**

3.    **5/4/04**:  Plaintiff, Lisa Graham, presented another "gamefilm",on another discovery she made while heading the refund of deductible process.   A customer pays for his /her deductible usually by using a credit card.  Asurion gets a lot of "chargebacks" throughout the years, which is where a card has been used for a deductible payment, and the card holder is disputing the charge with his/her credit card company. A credit card can be traced, linking to all claims  it was used against, (kind of like the tool used to trace the history of serial numbers).  Ms. Graham made the discovery that multiple cards  were linking to multiple claims, claims in which turned out to be fraudulent.  In other words, there were rings of fraud being made against Asurion Insurance Services, that she felt no one was aware of, and the data that Ms. Graham collected was proof of this. Multiple individuals were making fraudulent claims, providing a credit card the for deductible, disputing the charge, getting out of paying for the deductible, AND getting a high priced phone for free. These people were discovered to be individuals who were doing this "scam" to stock their own cell phone stores.  It was a crucial discovery, had been going on for a couple of years, in which the whole time plaintiff, Lisa Graham, had been attempting to get someone's attention on the matter.  So, these "gamefilm" presentations, were the perfect opportunity to do just that. At one point in 2003' approximately, one of the Attorneys for Asurion, Mike Ain, was brought into the discussion of this issue. Plaintiff is not aware if Mr.Ain is still employed with Asurion. He would be witness to the discussion if he is however, 615-837-3000 work number.

Well, the presentation was completely sabotaged by the new department manager, Carty Hassett.  Carty began to scrutinize the material a couple of minutes into the presentation, and after just a few more minutes, told everyone, "I'm sorry we wasted your time".  And it was over; just like that.  This was completely humiliating to plaintiff, Lisa Graham, as she put hours of preparation in the presentation, a couple of years of effort previously in getting some attention on the matter, not to mention so much effort into her career with

Asurion up to this point. In that instant, Ms. Grahams reputation of being such a dedicated employee became tattered.   Carty came from a company called "XO Communications", as did the new supervisor on the team who had just joined the Customer Sat. department, Donna Drehmann.  They were "good friends" in their words. (Caroline Harrod, who is still with the company, is a witness to this sabotaged presentation-Document referring to this, is attached for review. Caroline is an account representative at Asurion, and has been with the company to date for approximately 17 years, contact information is:   615-837-3028 - work).  **Attachment # 1**

 A curious question is: why would a presentation be completely sabotaged, by a NEWLY hired upper level management employee, on a discovery of something that was costing the company (or underwriter) hundreds of thousands of dollars (if not potentially millions) AND the data that was to be presented was clearly proving the fraud against the company, **AND WHY, after a total of 10 years from the initial discovery of this credit card fraud, is it still going on?**   Asurion has an underwriter (not sure whom these days-used to be Hartford per plaintiff), who actually pays out on the claims.

This is how it was explained to the "Elite" team, Customer Satisfaction Team years ago:

Customers of Asurion pay a premium each month to have insurance (approximately 6-7 dollars per month), when/if they file a claim, the underwriter for Asurion absorbs the cost of the claim, in return theunderwriter collects the deductible payments (ranging anywhere from  $45.00 to $169.00). Asurion receives a portion of the premiums, underwriter receives the majority. Again, by refurbishing phones that customers have filed claims on previously, and sent to Asurion (as it is the return policy/agreement), a lot of money would be saved by the underwriter and/or Asurion within the  "purchasing" aspect of the business. The instances where it would be more costly to Asurion/underwriter, is where a NEW ph was shipped out, and for a huge majority of the fraud cases, it was discovered that NEW, very expensive phones were what shipped out.  So, when the fraudulent customer files a claim, and disputes the cc charge for his deductible, he gets a NEW, expensive phone, free, and the UNDERWRITER is who loses- the one that pays out on the claim, and the one that ends up forfeiting  the deductible.  Asurions current customer count runs in the millions (95 million as read on line).  They have the monopoly on cell phone insurance, and have for years. Again, an extremely curious question would be, WHY… after a total of 10 years from the initial discovery of this credit card fraud, is it still going on?   And why has there been no interest in the obvious fraud against the company by Asurion Executives, until only AFTER the person who made the initial discovery (plaintiff, Lisa Graham)  filed an EEOC complaint against the company for retaliation for "blowing the whistle",  and only after CC merchants started contacting and questioning Asurion representatives about multiple uses of credit cards.    Please see attachment # 1 again for this.


4.   **5/13/04**  Plaintiff,  Lisa Graham, began noticing her emails missing. They were emails of a poking and prodding nature from Carty and Donna, and emails that supported business decisions she had previously made. **Attachment #2**

5. **5/14/04** Plaintiff, Lisa Graham, reached out to an HR representative, Karen Helton, as she needed someone to talk to. She wanted to share what was happening, and wanted to find out <u>why</u> these things were happening and was looking for some needed guidance; there was no response back from Karen, ever. Ms. Graham had never reached out to an HR rep before in the prior 6 years of employment, for any "issues". Again, Ms. Graham was not a complainer, nor a trouble maker, or attention seeker, etc. **Attachment # 3**

6. **5/19/04** Plaintiff, Lisa Graham, emailed Mike Jackson, the superior over Carty and Donna to attempt to meet , and again find out why these things were happening. Mike agreed, then backed out, stating Donna, and Carty can speak with her, and handle the issue. Donna and Carty; the very culprits that were creating the hostile environment to begin with. Donna Drehmann, and Carty Hassett.. the new supervisor, and new manager of the department.. who just came on board a couple of months earlier, right after the presentation of the defective phones shipping out over and over, both from a company called, "XO" . * Plaintiff read on line a few months ago, that Asurion has or is, in the process of opening up a new office downtown, Nashville; coincidentally next to, or conjoined with same building as "XO" Communications. Communication via email with Mr. Jackson, is attached, as well as information about the new Asurion office. **Attachment # 4**

7. **End of June 04'** Coworker Stephanie Woodard approached plaintiff, Lisa Graham, and pulled her aside into a secluded room. Stephanie advised Lisa that their team lead Tammy Harper, (African American) was "out to get her". No explanation as to why was provided by Stephanie, though plaintiff did ask. (Stephanie is witness, and still employed by the company). Stephanie's position currently is "Mgr. of Risk Administration", and contact numbers are, 615-837-3131 work, 615-403-1373 cell.

8. **July 04'** Plaintiff, Lisa Graham, was given a call at her desk. She was advised by supervisor Teresa Eldred (who was still transitioning new supervisor Donna Drehmann into her position), that plaintiff, Lisa Graham, had been given a promotion. She would be working with Stephanie Woodard on legal issues within the customer sat. team. There was NEVER another word about this "promotion" again. (Stephanie Woodard should remember this; plaintiff approached her with the "good" news 615-837-3131 work). Teresa is no longer with the company.

9. **10/20/04** Plaintiff, Lisa Graham, emailed an Asurion employee; Jennifer Ayer. Jennifer was a client services representative, which was basically a liason between Asurion, and the client; Tmobile, Verizon, etc… Plaintiff stated to Jennifer via Email, that she had spoken to a customer who had received 3 phones from Asurion, on one claim, all defective. The customer just gotten tired of the whole scenario of sending back a defective phone for yet another, and just wanted a refund of his deductible. He was going to cancel the insurance as well. Also, one of the phones shipped to that customer, had been found through tracing the ESN, to have shipped out to three prior other customers as well. Plaintiff , Ms. Graham, was upset about the issue, and the fact that defective phones continued to ship out over and over, AND of the fact Asurion was losing good customers, and made a suggestion to Jennifer to

possibly improve the "customer experience". No final response to Ms. Graham, by Jennifer was ever given about the issue. **Attachment # 5**

10.   **10/21/04**  Plaintiff also emailed supervisor, Donna Drehmann, stating that she is still finding that phones are not being repaired properly before they reship to another customer. Plaintiff wanted to do a follow up "gamefilm" on the subject, if possible, because now not only were defective phones still shipping out over and over, BUT the "return reason" that was being logged, was now showing as   "UNKNOWN"   instead of the actual reason that the customer gave when he/she called us, such as "power issues", or "drops calls", etc..   no follow up gamefilm was allowed to be given.   (supporting document attached)-   **Attachment # 6**

Someone posed the question at one point to plaintiff, WHY would the company send out defective merchandise knowingly? What would be the purpose?  There is a logical answer to that. Asurion processes on the average 20,000 claims per day. (keep in mind, there are around 95 million active customers -per information found on line). A huge majority of these claims processed daily are on a damaged device. Asurions return policy is the customer has to return the damaged device to Asurion;  and Asurion provides the pre paid envelope for this.  These are the phones that Asurion  "refurbishes", and uses to fulfill their future claims with.  This goes back to what executive team members have mentioned in the past;  "Asurion makes/saves  most of its money by using refurbished phones".  So the math is…  there's close to 20,000 phones that ship out a day; thousands being returned each week to asurion as a "salvaged return", there are maybe 40 repair technicians on site at the distribution center in Smyrna attempting to properly repair these phones, the phones quickly go on the shelf, packaged neatly in a box, ready to ship back out to the next customer.  (When plaintiff toured the distribution dept. in 2005', there were maybe 20 repair technician stations). There is not enough time in the day, or technicians on site to properly repair the thousands and thousands of phones that get refurbished.   A lot of the time, the customers just deal with the "glitch" of the phone, until they either upgrade through their carrier, lose, or further damage the defective phone that was sent, which happens often, creating the scenario of having to file a new claim.

11. **2/4/05**  Entire Customer Satisfaction Team met with CEO Bret Comolli at his request. Bret wanted the teams  input as to what the current customer complaints were. Plaintiff, Lisa Graham, provided data to Mr. Comolli showing phones were still shipping out, without being properly repaired.  Mr. Comolli later went to plaintiff Lisa Grahams desk, and thanked her. (Bret Comolli is witness, others still with the company who were at the meeting are Ken Page- "offline claims rep". (615-837-3000 work), Linda Konstable-"Compliance Analyst" (615-837-3057 work), and Cindy Reeves – "Sr. Compliance Coordinator" (615-762-1751 work).   **Attachment #7**

12. **2/7/05**  (approx.) Donna Drehmann called plaintiff, Lisa Graham at her desk. She stated that for the fact Lisa "opened her mouth" at the meeting with Bret, that she and Carty had a lot of "action items" to do. She stated that if plaintiff EVER opened her mouth again at a meeting, she, carty, and plaintiff, Lisa Graham,  will have to have a private talk. The call was extremely threatening and intimidating.  No witness. A curious

questions is, why would Donna Drehmann, who had been with the Asurion less than a year at this point, feel so comfortable to threaten a long tenured employee about something presented to the CEO, that was requested by the CEO?

13. **Middle of 05'**  Plaintiff, Lisa Graham, was demoted from a new division of the team she had currently moved to, called the Office of the CEO team.  This was a team in which handled sensitive issues, problematic calls, irate customers, etc.  The duty of refunds, was handed over to prior employee Judy Crowder, then soon automated.  Supervisor Donna Drehmann, had hired a friend, and co-worker, Rachelle Darvin (African American) , again, from "XO" to join the  team several months earlier.  Rachelle wanted a new supervisor.  Donna Drehmann gave her a new supervisor, along with plaintiff's position.  Plaintiff was demoted to the outbound team, the team Rachelle was on, the entry level team of the department, with no explanation other that what Rachelle told her which was she wanted a new supervisor.  There was no talk with Donna, nothing said to Ms. Graham, (plaintiff)  stating she did anything wrong to deserve the demotion.  The "OCEO" team, had more responsibility, more exposure, and higher pay scale, than the outbound team, all which would open up much more opportunity to advance, etc.  An individual still employed with Asurion, who would be a witness, is Sandra Miller , "Sr. Workforce Analyst, (615-837-3079).  **Attachment # 8**

14. **3/19/07**  Plaintiff, Lisa Graham, emailed another HR Rep, Terri Hudson, and this time did meet with her.  Ms. Graham had been observing many new team members throughout the last couple of years, come aboard, and move right ahead of her over and over,  despite plaintiffs  long tenure (Ms. Graham was the last original customer satisfaction team member still on the team), and continued loyalty to, and hard work for the company, and was still getting periodic pokes and prods.  She wanted to speak with an HR rep to finally tell her story of the sabotage, threat, toying, railroading, and harassment, and wanted Donna to be present, so that she could again, attempt to get some answers.  The HR rep and Donna Drehmann, unbeknownst to plaintiff, were pretty good friends she later found out. However, the HR rep stated that plaintiff, Lisa Graham, waited too long to address the issues, which plaintiffs  response was she had been trying to on multiple occasions.  HR rep Terri, asked plaintiff Lisa Graham what she wanted out of the meeting; Plaintiff Lisa Graham stated to just be left alone, and to be given the opportunity to advance that everyone else has been given at Asurion.  Terri said, "done". She went on to state that if plaintiff agreed to never speak about the issues again, and to "wipe the slate clean", she will do that for her.  Plaintiff agreed.

Plaintiff, Lisa Graham, sent HR rep Terri an email stating she hoped the retaliation would cease, but was not convinced that it would.  Lisa asked Terri to please send documentation of that meeting to her for the sake of having records of it; no response was ever sent back from Terri.  **Attachment # 9**

15. **4/20/07**  Announcement was sent out to the Outbound team (team plaintiff, Lisa Graham was a member of) stating the team was "downsizing".  The team had just acquired a few new team members just a few months or so earlier.  Everyone had to reapply for his/her position; out of 6 team members, only 3 would remain.  Ms. Graham

was on the team much longer than any of the other team members, was employed much longer with Asurion than any other team member on the outbound team, and was the only member who possessed her insurance license.

**Attachment # 10**

16.  **4/23/07** Plaintiff took the test given in order to reapply for the position she currently had on the outbound team. It was a very advanced excel test.. Test on different types of formulas, etc. Things that had never been used prior to the testing, and never used after the testing. Plaintiff, Lisa Graham was told to put on her recent yearly review what her main "weakness" was; she coincidentally put knowledge of excel. Plaintiff was advised she had to take test on her own, though all team members were helping each other, and were asking for assistance from prior teammate, Dawn Monceaux, who was currently taking computer courses in college. (yearly review attached). All team members on the "outbound team" were African American, at that time, other than plaintiff, Ms. Graham. **Attachment # 11**

17. **4/24/07** Plaintiff, Lisa Graham, (realizing what was going on), typed out and printed at work a rough draft of a letter she wrote to the (then CEO) Bret Comolli. She wanted to describe the experiences she had been having at Asurion for the prior 3 years, as she thought he would be someone who would want to address this type of behavior. Though she previously agreed to "wipe the slate clean" with HR rep Terri, and not mention her past experiences with Ms. Drehmann, or at Asurion again, it appeared as though the promise was not being upheld on the other end. Plaintiff printed the letter, and got side tracked. Someone later placed the letter on her seat at her desk. Not aware of whom. Letter: **Attachment # 12**

18. **4/24/07** Plaintiff expressed to one of the customer satisfaction supervisors, Camillo Arbealez, that plaintiff was also interested in applying for another position that had currently opened up on the Customer Satisfaction team; an "OCEO" position. This was the position plaintiff was demoted from without cause previously, and was being offered to the outbound team to apply for along with the 3 positions to remain on the outbound team. Camillo stated the hours for the position were 10:30-7:00 pm, with "no negotiations". Despite the later hours, and plaintiffs hesitancy to apply (as she had a young daughter at the time who would be home alone), plaintiff did express interest to Camillo, stating she would like to go ahead and apply, as ultimately she had to acquire whatever position that she could in order to retain employment with Asurion.

**Attachment # 13**

19. **4/26/07** Following Plaintiffs expressed interest in applying for the OCEO position, and interviewing for the position, the hours that were quoted as being 10:30-7:00 pm, with "no negotiations" were suddenly changed to 12:00 pm-8:30pm, which would knock plaintiff out of the running for that position due to her young daughter. Plaintiff had previously stated to Donna Drehmann, and Camillo (in person) that 10:30-7:00 pm would

be the latest hours she could work for reasons of her young daughter being home alone (supporting document attached). **Attachment # 14**

20. **4/30/07** Plaintiff was called into the office of Donna Drehmann, (dept. manager), by Terri Hudson, (HR rep). Donna, Terri, and the supervisor at the time, Matt Pregont, were in the room alone with plaintiff Lisa Graham. The meeting was supposed to be for the sole purpose of telling each team member, one by one, who made the "cut", and would remain on the outbound team. Terri quickly got to the point. She stated to plaintiff, Lisa Graham, "we heard you wrote a letter to Bret Comolli"? In which plaintiff stated, "yes I did". Terri went on to state, "have you given him the letter yet"? Plaintiff stated, "no, not yet". Terri then said, "if you don't give him the letter, you can retain one of the positions on the outbound team". Someone, (probably the person that placed the letter on the plaintiffs chair,), also apparently copied it and gave it to either Donna, Matt, or Terri. (Matt Pregont is still employed at Asurion, and is witness to this meeting - phone number 615-243-5430 cell, 615-445-2868-work), Job title: "Sr. Mgr. Client Services". Announcement of whom made the cut, is : **Attachment # 15**

21. **5/3/07** Plaintiff, sent an email to Terri, Donna, and Matt, basically gravelling, thanking them for letting her retain her job, and asking them if she was doing something wrong, to please tell her so that she could correct it. Plaintiff still could not understand why she seemed to be this "target" for all of the harassment and retaliation she was experiencing. Again, plaintiff Ms.Graham was not a trouble maker, wave maker, rule bender, or poor performer, etc…There was absolutely no response back from any of the three. (supporting document attached). **Attachment # 16**

22. **5/4/07** (approx.)- Plaintiff, Lisa Graham, called supervisor Matt Pregont on his cell phone, from her car on the way home from work. She was upset asking Mr. Pregont to give her position to another team member (Nancy Campbell) who had not made the "cut". Ms. Graham went on to say she should have been allowed to retain her position on the team due to all of her hard work and dedication, NOT because she was going to blow the whistle on the corruption of the management style, and her horrific experiences over the last few years. Mr. Pregont, simply said, "at this point Lisa, my advice to you, is to look out for yourself only". Matt should remember this phone conversation, 615-837-3000 work.

23. **July, 07** - Plaintiff found out from prior teammate that Nancy Campbell (the lead rep on the team at that time; African American), was telling people she, Ms.Graham, had a criminal record. She was showing team members how to pull Nash.gov, and search for the "criminal history" on individuals. She was said to have pulled up the name "Lisa Graham" (when Ms. Graham was not around), in which there is someone with that name that has a lengthy criminal record. It was said Ms. Campbell, was attempting to knock plaintiff, out of the running for one of the spots on the Outbound team months earlier, by spreading rumors that the Lisa Graham with the record, was the same Lisa Graham at Asurion.. The "Lisa Graham", with the criminal history, is NOT the Plaintiff, Lisa Scott-Graham for the record and the last 4 digits of plaintiffs Social Security number is 9920 should anyone need that. Plaintiff Ms. Graham, was extremely hurt, and did not

confront the other party, Ms Campbell. Ms. Graham looked upon her team members as an extended family, giving them Christmas presents, trying to create close bonds, etc… Pertinent documents are attached. In addition to the rumors being spread, Asurions HR team reached out to plaintiff in December of 07, questioning the name she had registered with the IRS. (plaintiff had been employed for 9 years at this point- with no name change since previous marriage in 1995, to a Charles Graham). Plaintiff did at one point email Ms. Campbell asking for the website to look up a persons criminal record so that she could look at the information herself. **Attachments # 17**

24. **8/15/07** Plaintiff, Lisa Graham, finally decided it was time to leave the team. A work from home program had started some months earlier. This was a chance to get out of the call center, work from home, and try to start "fresh". The position was an entry level position, the very same position Ms. Graham had when she started her employment 9 years prior.

25. **10/30/07** It appeared as though the baton may have been passed along, as plaintiff, started noticing calls with her customers, (that were being scored by a QA analyst Janisha Cain -African American), were not getting scored properly. Plaintiff addressed this with her work @ home supervisor, Marla Price (African American). Marla's response was , "some people get marked off for saying "aks" instead of ask, and that could be considered discriminatory, so you should stop questioning QA or they will really nitpick your calls". Ms. Campbell, Janish Cain, and Marla Price were friendly with each other, as plaintiff had seen them speak in the call center (Marlas and Nancys desks were about 20 feet from each other); however, plaintiff simply replied to Marla, she was not the one marking any one off for that, nor would she if she were in that position. **Attachment # 18**

It is imperative that calls are scored correctly and ethically, as bonuses depend on it, as does the ability to qualify for a good shift when the "shift bid" comes around. ( which came around every 6 months or so), as well as the opportunity to advance. Please see the attached document – subject line is "QA disputes". This is a recent call of plaintiff that was scored (July, 2012). The mark down was for not saying the customers name at least twice. There is a disclaimer, however, that if the name is difficult, the csr may use sir, ma'am in replacement of the name. Plaintiff was scored off for attempting to say first name once, then completing claim out with "sir". QA analyst stated the markdown was because, the first name "was not difficult". The customers name was; **URBONAVICIUS ARVYDAS** (Please see attached document.) There is also data included that shows when Ms. Graham recently received a new supervisor, Robert Gann, every call that was scored during the first month of being on his team was scored inaccurately. **Attachment # 19**

26. Around **5/9/08** Plaintiff saw that she was still getting marked off on items she should not be on her calls, and now she noticed that when the call scores were being sent to her, the recording of the call was getting linked to the email as well. Plaintiff, Ms. Graham, began listening to her scored recorded calls as well as some other representatives for comparison, as the recorded calls were all

linked to the email sent out to the entire team.  Plaintiff listened to a call of hers from 10/29/07, that was deemed as a "low QA score concern".  This would be a score that was sent across via email to the management enterprise as a red flagged behavior; the call however, was not scored properly. There was absolutely no red flagged behavioral issue at all. The call was long, it was problematic, but not a behavioral issue whatsoever.   When Plaintiff listened to another call of csr, (Stacey Smith, African American, and  friend of the QA analyst, Janisha Cain, African American) it was scored higher than the  "low score concern" of plaintiff, yet was not a good call.  The csr was pretty rude and condescending.

**5/9/08**  Plaintiff, Lisa Graham, wrote another letter to the CEO, and this time sent it to him, telling him of the unethical ways of the management style of the call center. She scratched the surface starting with the unethical scoring of the calls, but really was hoping for a one on one meeting with Mr.Comolli, so that she could describe, <u>finally</u> to someone that might care, the experiences she has had from when Donna, and Carty first came aboard back in 2004.  However, he handed the issue over to another HR representative, Kelly Rosalia.  **Attachment # 20**

27.  **5/15/08**   To make a long story short, the link to the call of csr Stacey Smith, mysteriously became inaccessible.  The explanation for that by Kelly, was the calls auto delete after a certain time period. The thing is, plaintiffs call was much older than Mrs. Smiths call, therefore should have deleted first if that were true. Plaintiffs call was still accessible. Plaintiff did call the Asurion IT dept herself, located in India, asking them why Staceys call was suddenly inactive.  The answer was they were advised to delete the link, and though they tried (at plaintiffs request), were not able to restore it.  Plaintiff did share this information with Ms. Rosalia, HR rep.   Plaintiff, Lisa Graham, never got the opportunity to have a one on one meeting with Mr. Comolli; Mr. Comolli never contacted Ms. Graham to find out the outcome of the "investigation" of her concerns.  And since there was no accessible recording of Stacey's call to compare to the "low score" call of Ms.Grahams, there was no evidence to show the biasness.  <u>Case was closed</u> by Ms. Rosalia, who concluded, if other "strange coincidences come up" (referring to the mysterious inaccessible link) to let her know.  Ms. Marla Price was promoted to call center manager soon after this incident.
   **Attachment # 21**

 Last March 2012', due to Asurions email changing over to a "new" email, Plaintiff Lisa Graham,  started to print off data that she might need for this complaint against Asurion. She printed off a copy of this particular QA call as she did not have a printer back in 2008';  The data of the call, was completely altered. It didn't even have the correct name of the QA analyst on the score card, which was Janisha Cain. The data of the QA scored call, as well as an email referring to the new email changeover is included. In addition to this, Ms. Graham's mailbox which contained over 25,000 emails, prior to the changeover, dropped down to around 2,000 MANY of which were altered. Reasons being, will be outlined further in this complaint.    **Attachment # 22**

28. **7/17/08**   Plaintiff had finally had enough, and was going to bow out gracefully, and look for other employment.  She requested from a different HR representative, Joyce Wallace, her yearly reviews.  She remembered getting some very good reviews and was basically going to use those to present to a potential employer,  when searching for a new job.  She was sent some reviews, however some were missing.  The really good ones were not included; the reviews from the years that she found a lot of fraud was missing, a review given by Donna Drehmann was missing (which was a good review and wouldn't justify the demotion), the review from the year she presented the gamefilm on the phones shipping over and over was missing. It seemed apparent to Ms.Graham what was going on- and why certain yearly reviews were missing; a lack of paper trail on plaintiff of being an exemplary employee throughout the years.  Plaintiff was upset about this, and decided she was not going to let a few people drive her from a company that, for the most part, she truly loved and had been with for years**.**   Plaintiff decided to stay at Asurion, as she was making a decent living, she knew her job well, and was working from home which was important as she would be there for her daughter.  **Attachment # 23**

Plaintiff eventually acquired a new supervisor, Eilease Preston, (African American) and they seemed to create a bond with each other. Ms. Graham worked hard at creating a bond of trust with Ms. Preston, and looked at her as a friend, not just co-worker. Ms. Preston worked on site at the headquarters location, in Nashville, and Ms. Graham, (Plaintiff), continued to work from home as a CSR representative, taking claims.

29. **6/9/09**  Plaintiff, (at the prompting of Ms. Preston), applied for a work at home supervisor position.  Ms. Preston (supervisor of plaintiff) stated to Ms. Graham that she felt Ms. Graham would make a good supervisor, and really encouraged her to apply.  Ms. Graham had prior supervisor experience within the call center industry, had been with Asurion for 11 years at that time, 7 years of it on the "elite" team, customer satisfaction, and had been in the call center industry for almost 25 years.  Two of the qualifications needed for this position were, the candidate had to be licensed with the state, (which plaintiff had been for years), and the candidate had to have prior work from home experience, (which plaintiff had for prior 2 years). A week or so after plaintiff applied for the position, Supervisor Ms. Preston called her at her home. Stated they needed someone to volunteer to go on site to do some UAT testing for a few days; testing of new applications, etc.  Ms. Preston stated that it would look good for plaintiff to volunteer to do that, especially since she was attempting to obtain a supervisory position.  Plaintiff agreed (Rick Dahlquist is witness, and head over UAT dept at that time- he is still at Asurion, contact work number is 837-3000).  Also, Supervisor Ms. Preston called Ms. Graham at home at one point, while the candidate for the supervisor position was still being decided upon, asking her to volunteer to clock in from home, from the hours of 12:00 am – 2:00 am on one evening. Ms. Preston stated there were some issues at the call center that was opened 24 hrs, and they needed a volunteer to help out. Ms. Preston said again, that since plaintiff was attempting to acquire a supervisory position, she should volunteer, as it would "look good". Plaintiff did volunteer, and took only 2 calls.

In the end, Plaintiff was not only rejected for the position, she was not even given an initial interview for the position, which was the very next step after submitting a resume and applying for the job. And in addition to this, when Eilease submitted Ms. Grahams yearly review for 2009', she stated in comments about Ms.Graham, that she (Eilease) had "asked plaintiff several times about looking into other promotional positions within the organization, but that she loves being a work at home agent and the team". Ms. Graham was extremely hurt and really taken aback about that, as she felt she and Ms. Preston had established a good friendship and trust. She mentioned it only to manager (Kathleen O'neill) during an on site meeting after Kathleen had inquired with Eilease at the beginning of 2010', if Ms.Graham (plaintiff) ever wanted to become a supervisor. Ms. Graham never talked about that with Eilase, as it was obvious what was going on; the same type of things that had been going on for years. Ms. O'neill stated to Ms. Graham, that she didn't know Eilease had put that in Ms. Grahams 2009' performance review, or WHY Eilease put that in the review, but she would make sure it was removed. On 8/26/2010, Plaintiff acquired yet another new supervisor , who was named Latonya Cross –(African American). Ms. Cross forwarded the midyear review that Eilease filled out on Lisa Graham, to her (plaintiff) for review. Eilease was Ms. Grahams supervisor for most of the beginning of 2010', therefore would be responsible for submitting her mid year review. It was sent to plaintiff; plaintiff, then had to fill out her portion of the review, etc. then send it back to new supervisor, Latonya. The exact same thing that Eilease wrote in Ms. Grahams 2009' review, was written again in the midyear review for 2010'…... the information that was supposed to have been addressed by, and removed by, Kathleen O'neill; manager . Some data pertaining to this is attached. Kathleen O'neill is witness and still works at Asurion, 615-837-3000 work . Eilease was eventually promoted to a supervisory position under the Customer Satisfaction umbrella (Return Merchandise Dept). Documents pertaining to some of this information are included in:  **Attachment # 24**

* Plaintiffs mother passed away unexpectedly and very suddenly due to heart failure on September 16th, 2012. Plaintiff was having a very hard time coping, and expressed this to her supervisor, Ms. Cross. This was a devastating, and huge loss for plaintiff and her family. In addition to plaintiffs mother dying on that day, plaintiffs father was rushed to the emergency room right when he arrived at the hospital. The family was at the hospital to view plaintiffs mother before she was transported to the morgue. Plaintiffs father was giving signs of having a heart attack; he isn't a healthy man, as he has had bypass surgery twice, and is almost 80 years old. It was a horrible ordeal, and again, plaintiff was completely devastated and heart broken, and so worried for her father. The newly acquired supervisor Latonya Cross, appeared to have used these times of sorrow, and worry, (interpreting it as weakness, and vulnerability), to "break" the plaintiff, in attempt to eliminate her from her employment with Asurion.

30.  **10/13/10**  Newly transitioned supervisor , Latonya Cross (African American) advised Plaintiff Lisa Graham, that Ms. Cross  was going to place plaintiff on corrective

action (which could, and often does lead to termination) for excessive break aux if she did not provide a doctors note outlining her issue with IBS (irritable bowel syndrome; which for obvious reason has gotten worse throughout the years) Ms. Graham stated to Ms. Cross that she had submitted a couple of Dr's notes in the past to excuse her from having to use the restroom more that usual at times; Ms. Cross stated HR had no note on file. Mr.Graham referred Ms.Cross to a prior yearly review where past supervisor, Eilease Preston had mentioned in the review that HR had approved the extra time needed off the phone for the IBS issue. Ms. Cross then said, "well, apparently HR did have it, but it must have been lost, but… now they needed an new/updated note". Most conversations about this issue were by phone during one on one weekly one on one coaching sessions. Plaintiff did however comply, and provided another note. The email that provided proof that plaintiff submitted a Dr.s note is attached as well as the review that states the extended break aux was approved by HR (for the fact that they <u>did</u> receive a note from a doctor) **Attachment # 25**

31. **OCT, 2010**   During a one on one weekly coaching session via phone, Supervisor  Latonya Cross stated to plaintiff she was going to place plaintiff, Lisa Graham on corrective action (which could, and often does lead to termination) for processing a customers credit card herself, and for not transferring the customer to the secured automatic payment line. There are a couple of red flags with this threat however; first issue is, the system doesn't offer the auto pay option on every call.  The other issue is, customers will sometimes specifically ask the CSR to process the card transaction for them (that's why the ability to do so is there), because the customer may be driving, may be on the defective phone they're calling about (afraid the phone wouldn't collect the proper numbers they would be pressing for the credit card transaction), or sometimes they just don't want to do it themselves.  A lot of people just don't care for automation.  It would be extremely poor customer service to decline this request especially since the csr's have the ability to do so. In addition, as stated in an "informative data base"  (that csr's have access to at Asurion for when/if  they have questions, or need help with a certain issue), CSR'S are allowed to process a credit card transaction if need be for the customer. See  **Attachment # 26**

32. **NOV, 2010**   However, Ms.Graham knew she wasn't processing that many credit card transactions herself, despite the high numbers that Ms. Cross was quoting for this, so she started to take a tally following the conversation about being placed on corrective action. During another one on one phone coaching session a few weeks later, Ms. Cross mentioned that Ms. Graham <u>was</u> going to be placed on that corrective action she initially spoke about, because the numbers were still high.  Ms. Graham then stated they couldn't be as she had been taking a tally, and there were only 4 different claims where she took the cc information herself for the claim.  (Each CSR takes approximately 80 calls a day on the average).  Ms. Cross, caught off guard, stated she would have to speak to call center manager, Sheila Rednour when she gets back from vacation so that she could find out why plaintiffs numbers appeared to be "off".  Ms. Cross  placed the corrective action paperwork on hold.

33. **12/13/10**   Plaintiff, Lisa Graham, touched base via email with supervisor Latonya Cross about their conversation about being placed on corrective action.  She wanted to know the outcome of the issue, and why/how her numbers appeared to be "off" right at the same time the "corrective action" was being threatened, and possibly put in place.

34. **12/14/10**   Ms. Cross didn't provide an explanation about the numbers being "off", didn't make any further mention of the pending corrective action , nor did she provide any information about her conversation with call center manager, Sheila Rednour.
 Ms. Cross simply provided some new  (correct) data, and said  "great job, much improved".   **Attachment # 27**

35. **12/20/10 (approx.)** Plaintiff consulted an employment attorney  (Andy Allman of Hendersonville,TN) concerning the years of retaliation that had finally become too unbearable.  Mr. Allman stated to plaintiff that her case was <u>extremely</u> strong, and that the first thing she had to do before filing suit, would be to file an EEOC complaint against Asurion.  Mr. Allman charged $1,500.00 to do this for her, which Mr. Graham gladly paid.   Ms. Graham did attempt to file an EEOC complaint on her own initially, but when she began to describe her experiences to the EEOC investigator, Marlene Dameron- (African American) within the first few minutes of their conversation, Marlene stated she doesn't "see it"  (meaning the discrimination/retaliation).   Marlene stated she can go ahead and close the case, and give Ms.Graham a right to sue notice however.
 Ms. Graham was not even given the opportunity to provide most of her data that supported the circumstances.  Ms. Graham was upset, she began crying, and stated this is exactly how she has been treated by her employer, and stated she wanted an actual investigation to be done.  So many years of retaliation had already had gone by; no one at Asurion stopped the retaliation, and actually seemed to have encouraged it.    Plaintiff, Ms. Graham asked to speak with a supervisor of the EEOC. She then spoke with Deborah Walker, (African American), who took down Ms. Graham's information. Plaintiff stated to Ms. Walker that, that she will have an attorney represent her in with the charge that was being filed. Mr. Allman, attorney, then took over, and soon after filed the complaint on Ms. Grahams behalf with the EEOC.

36. **1/27/10**   Plaintiff received a call from someone at the EEOC office, stating they had been trying to contact Attorney Allman since 1/11/2010.  They needed to obtain some information about Plaintiffs charge, and they had not been successful at reaching him. The EEOC representative (gentleman)  stated to plaintiff that  "time was running out" (plaintiff was not certain as to what he was referring to), and that they needed to speak to Andy. The person Andy needed to call, (per EEOC rep), was *Marlene Dameron* – The gentleman provided a contact number for Ms. Dameron, in which plaintiff emailed to Mr. Allman. Plaintiff also asked Mr. Allman within that email if they were still proceeding with the lawsuit; Mr. Allman simply replied, "yes".  Ms Graham had stated from the beginning, that what she really wanted was to go to trial against Asurion.  There was so much retaliation that had gone on for so long, with no remorse, no explanations, and no help from anyone, that it seemed like the logical, <u>necessary</u> thing to do. It seemed

like it was going to be the only way to get any answers, AND to prevent this from happening to anyone else. **Attachment # 28**

37. **March, 2010** (approx. mid march)   Mr. Allman stated via phone conversation with Ms. Graham, that Asurion wanted to settle the matter; An investigation was apparently not going to happen. The charge was at that point placed under "mediation" within the EEOC. That was disappointing to Lisa Graham, plaintiff, as she really wanted the charges to be investigated by the EEOC. The plaintiff desperately needed some sort of acknowledgement that the retaliation happened; she needed some answers as to WHY it happened, (she was unable to get that on her own though she tried multiple times),  and she needed some sort of vindication for the years and years of the toying, and retaliation.

**Prior to filing an EEOC complaint, the <u>only thing</u> plaintiff wanted, (and her patience, endurance, and pleas shown in documentations for help prove it) was for the retaliation to stop, to be treated fairly, some ownership, and an apology.**

However, Mr. Allman advised Ms. Graham to write her letter of demand, in an attempt to close the matter.  Ignorant to the process, and lingo, Ms. Graham asked Mr. Allman what a demand letter was, and what it needed to contain.  Mr. Allman stated to write down how much accrued PTO and vacation time she currently had. Accrued pto and vacation time? That is something she had already earned.  With the lack of communication with Attorney Allman throughout this case, (non returning of calls, unresponsiveness to emails), this was a big red flag to plaintiff that something was *not quite right*.   All along, Mr. Allman had been saying the case was "huge", the plaintiff knew the case was strong, and had plenty of documentation, and witnesses to prove the strength of the case. But, yet, he was going to be ok with the settlement of accrued PTO  and vacation pay? He was working on a contingency basis after all.  Email to Mr. Allman is attached; there was no response back from that email to Mr.Allman.  **Attachment # 29**

38. **8/22/11**   Feeling defeated, and completely unaware on how to write a demand letter, plaintiff researched the subject on line, wrote her letter, and forwarded it to Michele Mize, Attorneys paralegal.  The request for the demand letter was obviously a clue that no one from Asurion was interested in speaking to plaintiff about the years of her experiences face to face, and that no one had any intention in attempting to apologize and to try to make things right.   So, plaintiff wrote her letter; she was furious, hurt, betrayed, and exhausted. Over 7 years at that time of pure retaliation, harassment, and bamboozlement… with no help, no one to talk to, no one willing to stop it.   In her demand letter, plaintiff, Lisa Graham, ultimately requested a 1.5 million dollar settlement, a years worth of paid health insurance, and attorneys fees. **This large amount (deserved amount honestly) was plaintiffs way of  FINALLY , in one last attempt, trying to get someone's attention at Asurion, on what she has been forced to endure.**  And in all honesty,  Plaintiff felt  (and still feels) that this is a low figure, and that there truly is not enough money in Asurions bank account to make up for what she has been through.  Plaintiff did state to Michelle (paralegal) that the amount she was requesting was something she was not going to negotiate.  It was an amount that plaintiff truly felt would make her somewhat "whole" again. And plaintiff also stated in that

email, that she prefers to go to trial rather than take a settlement of money and to just "disappear", anyway. Plaintiff endured too much, for too long, and truly didn't want anyone else to potentially go through that. And, as proven, plaintiff had/has been trying to "negotiate" with the Asurion representatives to leave her alone for years, to absolutely no avail. (please refer to attachment 9 for reminder of this, if necessary). Demand letter is: **Attachment # 30**

Ms. Graham never heard anything from Mr. Allman concerning the demand letter she wrote, and within the next couple of months, the retaliation of her employer began to intensify. The more the pressure at work intensified, the communication with Attorney Allman became less frequent. Plaintiff called Mr. Allmans cell phone a few times attempting to speak with him, and to tell him how things at work were intensifying; not the actions of someone concerned of a lawsuit. Plaintiff was getting more threats of unwarranted corrective action, still getting marked off on calls when she shouldn't be, and she started noticing emails again that were being tampered with. Plaintiff was looking for advice from Attorney Allman. She didn't know how to handle the situation, and was completely baffled by Asurion continuing full force with their antics. Ms. Graham received no response from Mr. Allman. At one point plaintiff called the EEOC, and spoke with Chris Wing; mediation EEOC rep. Plaintiff stated she was curious as to what was going on with her case, telling Mr. Wing she hadn't been able to reach Andy, and that the retaliation at work was intensifying, etc.. . Chris stated he had her file on his desk coincidentally, and had just left a message for Andy to call him. Chris went on to say, that if settlement negotiations have ceased, he needed to know. I told him I had no clue what was going on either, and really didn't know what to do. Chris said politely "you can fire your attorney". Plaintiff took it as a piece of helpful friendly advice, but now thinks it may have been possibly a subtle hint. Mr. Wing should remember that conversation.

39. **OCT. 2011**    Plaintiff ended up receiving a phone call from Andy Allman , mid Oct. of 2011', after reaching out to paralegal via email a couple of times. She was looking for an update on the case. Mr. Allman stated they were getting ready to set a date to go before a magistrate to "value the case". He was still stating as well he was willing and ready to file suit. Andy said it would probably be after the holidays though that we would meet before a magistrate. There was a lot of stalling around. At one point during the whole ordeal, Andy said Asurions attorney, who he said he had been talking to regularly and "knew well", was on a maternity leave, so everything was at a standstill at that time as well. Plaintiff believes that was during the summer of 2011'. But, after the holidays, said attorney Allman, "we are all supposed to go before a magistrate, and value the case", and proceed from there. Plaintiff went along with this, as she was completely uneducated on how this type of thing is supposed to progress and transpire. She was concerned however, due to the multiple red flags that kept raising. With continued blind faith, lack of knowledge of how the system works, and trust in her attorney, Andy Allman, plaintiff continued to go along with the program. **Attachment # 31**

40. **1/5/12**    Plaintiff emailed Andy Allman, attorney. The holidays were over , and it had been a several weeks since they touched base. Plaintiff asked Mr. Allman about the

progression of the meeting he was scheduling to go before a magistrate. There was no response from Mr. Allman. **Attachment # 32**

**41. 1/18/12**   Plaintiff emailed paralegal Michele Mize, stating she feels alone and very vulnerable (due to the lack of communication with Attorney Allman, and due to the ways things were continuing to intensify at work). She stated her health seemed to be deteriorating as well; chest pains, hives, lack of sleep, and IBS getting worse.   Plaintiff was hoping to get some information on possible closure.   At this point she had been through so much, a settlement and closure would have been fine just to end it.   But, there was no response from Ms. Mize.   **Attachment # 33**

There is an explanation Ms. Mize didn't respond to Ms. Grahams last email. Plaintiff found out Mr. Allman moved his office, and Michele Mize did not go with him. However, since Michele was the person who had been assisting Ms. Graham all along with this case,  for over a year at that point, wouldn't the professional, decent thing to have done, would be to respond to plaintiffs email, advising her of Mr. Allmans move, and provide his new email address, office address, and phone number?   Ms. Graham received no response at all from Ms. Mize on that last email she sent her in a plea for help and guidance.

Ms. Graham ultimately called the office of "Kelly and Kelly" in at attempt to speak to Mr. Allman, and that's when she found out Mr. Allman moved locations. Ms. Graham called the new office, and spoke to Mr. Allman.  Ms. Graham stated she was concerned about all of the red flags about her case, and lack of communication with him and that she was possibly going to seek new counsel.  Mr. Allman immediately had his new paralegal "charity" set a appointment for Ms. Graham to meet with him at his new office.  The meeting was scheduled a couple of days later to Plaintiffs best recolection.

Ms. Graham met Mr. Allman face to face one last time, and asked him why there has been hardly any communication between the two of them, especially since he keeps saying the case is so big.  Plaintiff out of curiousity, asked Mr. Allman why he moved his location.  Andy shared some information with Ms. Graham. He said he has been very busy with "120" cases, with little to no help at "Kelly and Kelly", which supposedly prompted his move to his new office. He also stated he has to give them (Kelly and Kelly) a percentage of his income for the year, for the office space; stating he paid them over $200,000.00 for 2011'.   Plaintiff went into the fact, that she was concerned about everything that Mr. Allman has been saying he is "going to do", but has done none of it so far, and at that point, it had been over a year.  (Andy had previously stated several times, that he was going to request a right to sue notice, set a date to go before a magistrate, work on a settlement amount, prepare to go to trial if necessary, etc..).Ms. Graham and Mr. Allman had not even gone over her data proving her charges  at all together at that point, and expressed her concern about that.   Ms. Graham was also very concerned about Mr. Allman moving, and not giving her the heads up, by phone call or email.  After all, again, this was such a "HUGE" case per Andy. There were way too many red flags that were causing a lot of concern to Ms. Graham. Not to mention, the retaliation was not ceasing at her employment, it was actually intensifying, which

wouldn't have been the normal actions of a company, if they were concerned about a potential lawsuit. Ms. Graham shared all of her reservations with Mr. Allman, and told him that was why she stated she might have to seek new counsel to handle the case. Mr. Allman looked plaintiff right in the eyes, and stated he was sorry, that he has hired an attorney and 2 paralegals alone to handle her case. He then asked her not seek a new attorney, to give him another chance, and that everything was going to go full speed ahead at that point. Ms. Graham found out at some point by paralegal, Charity, that the attorney Andy supposedly hired was a gentleman in Memphis, named Andrew Clark. Plaintiff never spoke to another attorney, never spoke to any of the two new paralegals that were "assigned to her case"… ever.

However, plaintiff, Ms. Graham, hesitantly agreed, stated she needed to hear that kind of information to ease her mind, and she thanked Mr. Allman. That was the last time she saw him face to face. Ms. Graham mentioned to Mr. Allman one last time during that meeting, the same thing she said a few times before, which was she really preferred to go to trial against Asurion, that she didn't want anyone else to go through what she had been through with this company. Ms. Graham stated to Mr. Allman, it isn't always about money. Mr. Allmans response was, "it is to me, I have to get paid". Again, that was their last face to face conversation.

There was one more phone conversation with paralegal Charity, with whom Ms. Graham never met in person). Ms. Graham called "Charity" approximately in mid March. There had been no further progress once again concerning plaintiffs case. There was no further communication from Andy, no contact from either of the two newly hired paralegals, or newly hired attorney, Andrew Clark. Charity went on to say they were once again, "getting ready to request the right to sue notice within the next day or two, THEN we have 90 days to file suit".

Plaintiff thought about that conversation, and about the sequence of events over that last year and few months. And she thought about the red flags that were raised one by one, and how trusting she had been in her attorney, and naïve to the whole process. Plaintiff called Attorney Allman, on March 23rd, 2012, and confronted him. Plaintiff stated that it appears she has been strung along intentionally throughout this whole ordeal. Plaintiff stated though Attorney Allman continues to say the case is huge, he doesn't seem to have any interest in it at all, not as far as representation for the plaintiff anyway. Plaintiff stated to Attorney Allman, that he continues to make promises, that are completely never fullfilled. Attorney Allman still had not even gone over plaintiffs pertinent proof that shows what she had been through with Asurion. Ms. Graham asked Mr. Allman, why have they not yet gone before a magistrate as he kept saying they were going to do. Mr. Allmans response: "we are, but now they have a lot more on you". His voice was cold, attitude was arrogant, yet calm, he was not at all surprised about the flow and topic of conversation, and his demeanor was completely NOT the demeanor of an attorney who was on the side of a client that had a extremely strong, potentially very valuable case.

After learning a little more about the process, Plaintiff found that going before a "magistrate", could be the point in which the case is thrown out, and not allowed to

proceed with a trial. Plaintiff strongly believes this was the intention; it being more lucrative for certain individuals to "throw the case under the bus", (for lack of better words), as opposed to going to trial, and exposing the practices of giant, powerful corporation like Asurion. And this would explain why, that during the several months after filing the initial EEOC complaint, certain instances and sequence of events happened the way they did at her employment. In dragging out the case, through talk of mediation, requesting a right to sue notice, going before a magistrate, reviewing pertinent documents, hiring new paralegals and new attorney, etc, etc.. that bought time, giving Asurion the opportunity to mold and manipulate data, people, and circumstances to use against plaintiff, destroying some, if not all, of her credibility. It's all been a very carefully executed plot in plaintiffs opinion, to have the case dismissed, and to prevent exposure of the questionable practices of Aurion Insurance Services. On March 23rd, 2012, Plaintiff terminated the "representation" of Mr. Andy Allman.

**Important... Bellow, are circumstances that started happening at Asurion right around the time Ms. Graham terminated services with Andy Allman:**

* **3/16/12** announcement was sent out that company email was migrating to new "exchange 2010"; effective 3/19/12 at midnight. **Attachment # 34**

* **3/19/12** Plaintiff was going through emails to see if there was something she needed for her case before the change went into effect. Just in case any emails were lost, which Latonya Cross stated that emails should all transfer over. Plaintiff noticed while searching through email, a lot of emails had been "altered".

* **3/21/12** Plaintiff sent email correspondence to HR rep Greg Dyson, and Director Mike Finn, stating she has noticed manipulations on her "new" email, etc.. (coincidentally, plaintiff had well over 25,000 emails in her deleted box; after the changeover, there were 2,000) which was not supposed to happen per Latonya Cross. **Attachment # 35**

* **3/22/12** plaintiff was on a call, and needed assistance from a lead rep. She called the usual ext. to speak to one; however, the voice was that of Latonya Cross, her supervisor. Latonya was posing as a lead rep obviously, and never announced herself by name. Plaintiff asked the pertinent question, in which Latonya stated "we no longer do that". The call ended very quickly. Plaintiff, (knowing that was Latonya and wondering why, and wondering what the purpose for this unusual circumstance was) called another lead rep, and received an actual lead person that time. She asked the pertinent question, the lead rep took care of the issue, call ended. The reason for this was obvious... It had been disclosed to plaintiff, by a prior team mate on the Customer satisfaction team, Connie Terrell, that Asurion was in the process of "setting up" plaintiff. These calls were being tested (per different inside anonymous source), as plaintiffs call were getting ready to be routed to a hired "contracting" team for these "set ups", so that they would have the necessary manipulated data they needed to attempt to have this lawsuit against Asurion dismissed. The anonymous tipper, stated this extremely well orchestrated "project" was being handled away from the Nashville area, and provided the firms name in which the contract workers were being hired out of. Plaintiff did mention that call with Latonya, to

Latonya in their next one on one coaching session; Latonya laughed nervously, stating that was not her. (email referring to this to new supervisor Robb Gann, is attached. The anonymous tipper, also stated there is a gentleman , previously from "**XO Communications**", (just like Donna Drehmann, and Carty Hassett) that is a participant in the project of setting up Ms. Graham. He is a "solutions engineer" at Asurion. This persons profile is attached. Anonymous source also touched base on the fact that individuals with the carrier in which the plaintiff takes claims for, are involved in the bamboozlement of Ms. Graham, as well, as they are at an extreme risk potentially also. If it is made public knowledge that Asurion sends out defective phones knowingly, and the carrier in question has known this, (as their customers have been making them aware of this for years), the carrier would stand to lose multiple customers, not to mention the media exposure it would create. Also, the fact that the findings of "fraud" against Asurion, were discovered (as previously mentioned) were a lot of the time store reps (with the carrier) that were committing the fraud.

 The carrier has all the ability to set up completely phony accounts, creating the ability for these "contract workers" to stage phony calls, hence creating the necessary documentation needed against Ms. Graham, plaintiff, to do whatever is necessary, discredit her ethics, honesty, and integrity.     **Attachment # 36**

* **3/22/12** Latonya Cross (supervisor of Plaintiff) sent out an email to the team stating she was going to be "out of the office" (or away as she works from home), from 3/23 through 4/1. This is when it was told to plaintiff that Ms. Cross, (who , per inside source, has been one of the lead people in spearheading a plot to set up plaintiff ) was hiring, coaching, training the newly "contract" workers for the project. Since the newly hired contract workers, would be people plaintiff would have never spoken to before, and recognize, they devised a name for this team, called "the resolution team", and came up with a reason for the team,which was to combine the tech support, and lead support teams as one team. These calls started right when Latonya went away. On Aug. 14th, plaintiff sent instant chat to a fellow teammate asking about these so called "resolution calls"; the fellow employee stated she "never noticed it". Five months prior is when plaintiff started taking these calls where the lead reps were announcing themselves at the resolution team. The fellow team mate definitely would have noticed this change if she were also getting these types of calls when calling the lead team. These contract workers are out of Houston, TX, mostly African American, per inside tipper, and it's said that Donna Drehmann, is now the "contact" person for Asurion Road Side Assistance BBB complaints, which coincidentally is closing, as are call centers in Houston for the Carrier Plaintiff takes claims for. Data is included    **Attachment # 37.**

* 3/23/12 Plaintiff fired attorney Andy Allman.

* July 2012 Lisa Graham, was on a coaching session with new supervisor Robb Gann. The call was a good score, but like always, its common for the supervisor to listen to the call with the CSR on the line. Again, Ms. Graham works from home, as does her

supervisor. This is all done via phone.  The recorded QA call was playing, when all of a sudden Robb dropped off the line. Prior supervisor, Latonya Cross then emailed plaintiff, stating Mr. Gann lost his electricity, and would call plaintiff in a few minutes. Ms. Graham continued to listen to the call, to the end,   and at the end, wrote down the claim number that she provided to the customer to pull up later so that she could see how it ended.  (claim at that point was not completed by the customer). While waiting for Robb Gann to call her, Ms Graham went ahead and pulled up the claim number that she wrote down, and saw that she had not initiated that claim at all.   Any time a csr starts a claim, or completes a claim, the system automatically notes the clam with an automatic stamp that shows who has been in the claim. Plaintiff, baffled, searched the cell number, and found another claim that had been initiated under that same cell number. THAT WAS the claim that plaintiff initiated and it was cancelled by another rep. The same rep  that started the claim, the one with the claim number  that was read off by plaintiff  to the customer.   What this is showing, is that there are now very high tech maneuvers being implemented, to set up, manipulate data against Lisa Graham, plaintiff. Numbers in this instance, were obviously copied and pasted again in a high tech maneuver, using plaintiffs voice. The fact she was allowed to discover this by "accident" was more than likely an intimidating tactic to persuade plaintiff from continuing with her lawsuit, in letting her know who has all the power and control.   Again plaintiff was already told by two people, one Connie Terrell, another,  an anonymous caller, that she is being completely set up. And the sequence of events were clearly outlining those tips.  Connie Terrell also stated that Asurion has access to "*EVERYTHING*", in which they can use to really do severe, even potentially damage that could cause great legal problems for plaintiff.      And they do: they have access to plaintiffs social security number, plaintiffs address, has a copy of plaintiffs birth certificate, access to plaintiffs computer IP address, plaintiffs computer (as Asurions IT dept. can remote in at any time), plaintiffs banking account information (as plaintiff has direct deposit), plaintiffs customers personal information, (credit card numbers, checking account information- as they can monitor at any time plaintiffs calls)-  **Asurion can do great damage, and will, if needed to squash Ms. Graham from pushing for a lawsuit in pursuit of justice. <u>She has been advised of this.</u>**

* Prior teammate and "best friend" Connie Terrell, (African American) was claiming to have been in the same situation Ms. Graham was in;  receiving horrible treatment, retaliation, etc. Ms. Graham, and Connie Terrell had been good friends (according to Lisa Graham) for years, ever since Ms. Terrell started her position on the Customer Satisfaction Team, back in 05' approximately.    They kept in contact periodically via phone after Plaintiff decided to work from home as a CSR in 2007'.  However, they became even closer when plaintiff, began experiencing the continual treatment, in which ultimately forced her to file an EEOC complaint, and to file a suit against Asurion.

Ms. Graham, and Ms. Terrell, spoke several times throughout each week. They were like sisters per Ms. Graham, and even ended the phone conversations with an "I love you". And they felt as if they only had each other to talk to about their circumstances with Asurion. They had been employees for years of the company, worked on the same team, had experienced (supposedly) the same type of treatment.  So this bonded them very

closely, and they spoke to each other candidly about their cases, and circumstances with Asurion. They truly felt they could only speak to each other, because they could relate, and truly understand what the other one was going through. Connie was suddenly terminated in the spring of 2011, supposedly for not handling a customer properly. In which she ultimately ended up filing an EEOC complaint against Asurion herself, for wrongful termination.

So, from the spring of 2011' up to March, 2012, Ms. Graham and Ms. Terrell spoke weekly, sometimes daily to each other, and was each others sole support system basically. But in February of 2012', Ms.Graham started to get suspicious of Connie's honesty and truthfulness of what she was saying that she her self, was experiencing with Asurion. Connie seemed to know things that she really wouldn't unless she had contact with people at Asurion. She was the one that gave that heads up of plaintiff being set up, she stated to plaintiff to "document EVERYTHING" in her claims, and was the one that made the comment to Ms.Graham, that Asurion has access to "everything", to watch out. Though Ms. Graham had suspicions of Connies validity of a lot of things at that point, it was obvious that Connie felt some sort of loyalty to Ms. Graham, and was truly warning her. Ms. Graham found out on the same day she fired attorney Andy Allman, that Connie had been rehired by Asurion (if she even left the company at all), as she called the company anonymously, and was transferred right to Connies desk. Ms.Graham hung up, and didn't speak. She was completely devastated, and felt so betrayed. She realized at that moment what had been taking place; Ms.Terrell was obviously put in place as an informant for Asurion. Ms. Terrell has not called Ms.Graham one time after that, (And remember, they had been speaking to each other on several occasions throughout each week for months up to that point). This not only proves the underhanded plot of Connie being used as an informant, but it also validates that discrimination did take place against Ms. Graham and it shows what kind of low level stunts that people at Asurion will pull in order to squash anyone or anything that disrupts them, gets in their way, or makes them a little uncomfortable.

The attorney for Asurion, Yanika c. Smitt-Bartley, ultimately did provide a settlement offer to plaintiff via email on July, 9, 2012, to settle the matter once and for all. This was to be their "FINAL and ONLY offer" –   The offer: $18,000.00 , 6 months of cobra insurance, immediate resignation, and for plaintiff to sign a gag order on speaking about any claims against Asurion.

$18,000.00- to make up for **8 years** of enduring retaliation, sabotage, railroading, toying, demotion, failure to promote, discrimination, threats, harassment, bribery, defamation of character, tampering of evidence, evidence of persuasion (attorney), failure by HR,management, CEO , and others, to cease the behavior. Not to mention,  the **grand finale**; the "project" put in place to finally "get the job done" and have plaintiff, Ms.Graham removed from her position once and for all, in a completely underhanded, degrading, low life, corrupted, illegal way.   $18,000,00 and a kick out the door.  Fifteen years of undeniable loyalty, and complete dedication to the company, and years of pleading to just be left alone to do her job,  and this is Asurions going price for completely destroying one of the most dedicated employees they've ever had.

Despite that, Plaintiff can not and will not be forced into signing any kind of gag order that prevents her from speaking about her experiences with Asurion, if for no other reason, for the fact that she has been told, (and her experiences at Asurion prove this to be valid) that she is 100% being set up by this company. Therefore, when/if any "repercussions" arise in the future from these "set ups", it would be necessary for plaintiff to talk. **Attachment # 38**

Plaintiff, Lisa C.Scott-Graham, believes and alleges whole heartedly without a shadow of a doubt, that she has been the victim of extreme retaliation for over 8 years now, for bringing forth to executive team her discovery of Asurion sending out defective phones to its customers knowingly, for her continual efforts in pushing for positive change, and for her refusal to just "go away", and be silent.

The plaintiffs employers actions against plaintiff, Lisa Graham, are willful, intentional, encouraged, rewarded, cruel, and calculating, and are intended to deter her (or anyone else) from reporting any kind of questionable activity within the company, from speaking about any questionable activity within the company, from attempting to further promote within the company, and lastly from continuing her employment at all, with the company.

WHEREFORE, plaintiff pleads judgment, by jury trial, for damages suffered as a result of defendants conduct as alleged herein, including but not limited to, back pay, and for punitive damages; for prejudgment and post judgment interest on any and all damages awarded, for reasonable attorneys, and the costs of this cause.


I ask you please (Judge who reads this complaint) to please allow this to go to trial. I (Lisa Graham) am the one that wrote and filed this complaint. I had to submit this before the statute of limitations ran out. This is a bamboozlement case in the worst form, which deserves an honest trial, and FINALLY a chance at some sort of justice. I am in the process of searching for new counsel.


Thank you,

Sincerely,

Lisa C. Scott-Graham
615-431-5349

129 Cherry Hill Drive, C3
Hendersonville, TN   37075